IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DOW CORNING CORPORATION,

      Plaintiff/Counter-Defendant,

vs.

WEATHER SHIELD MANUFACTURING, INC.,
SNE ENTERPRISES, INC. and PEACHTREE
DOORS AND WINDOWS, INC.,

      Defendants/Counter-Plaintiffs.

Case No. 1:09-cv-10429
Hon. Thomas L. Ludington

---

| HOWARD & HOWARD ATTORNEYS PLLC | NANTZ, LITOWICH, SMITH, |
|---|---|
| Michael V. Kell (P15805) | GIRARD & HAMILTON |
| Mary C. Dirkes (P42723) | Mark R. Smith (P33166) |
| Michael O. Fawaz (P68793) | Attorneys for Defendants/Counter- |
| Attorneys for Dow Corning Corporation | Plaintiffs |
| 450 West Fourth Street | 2025 East Beltline, SE, Suite 600 |
| Royal Oak, Michigan 48067 | Grand Rapids, Michigan 49546 |
| (248) 645-1483 | (616) 977-0077 |

---

## DOW CORNING CORPORATION'S MOTION TO EXCLUDE
## THE TESTIMONY, REPORT AND OPINIONS OF DR. G. FRED WILLARD

Plaintiff/Counter-Defendant Dow Corning Corporation ("Dow Corning"), by its undersigned attorneys, moves this Court for an Order excluding the testimony, report and opinions of Dr. G. Fred Willard, an expert witness identified by Defendants/Counter-Plaintiffs Weather Shield Manufacturing, Inc., SNE Enterprises, Inc. and Peachtree Doors and Windows, Inc. (collectively, "Weather Shield") for the reasons that: (1) Dr. Willard is not qualified to render an expert opinion regarding the window/door industry due to his lack of requisite

knowledge, skill, training, education and experience; (2) Dr. Willard's testing methodology is unreliable; and (3) Dr. Willard's testimony and opinions will not assist the trier of fact.

This matter involves a hot-melt silicone sealant and its application in the window and door manufacturing industry. Dr. Willard fails to qualify as an expert in this industry; his opinions are invalid and based on suspect methodology; and his testimony will not assist the jury.

Specifically, Dr. Willard: (a) admittedly is not an expert in silicones; (b) has no education or experience with respect to hot-melt silicone sealants, particularly in window/door manufacturing applications; (c) has never inspected the Defendants' window/door manufacturing lines or processes and, in fact, has never spoken with any of Defendants' representatives other than counsel; (d) has no prior experience with the particular silicone sealant at issue; (e) has never been employed by a window/door manufacturing company; (f) has never been involved in the manufacturing of windows/doors and, in fact, has only once watched windows being manufactured during a sales call - more than two decades ago; (g) has never used the silicone sealant in the application of manufacturing windows/doors; (h) is not knowledgeable regarding an established industry standards organization or its standards; (i) conceded that the sampling of the sealant he tested was less than ideal; (j) "tested" product which was by definition unusable; (k) failed to test for the characteristic that forms the basis of Defendants' primary complaint; (l) performed tests that he could not interpret or from which he could draw no conclusions; (m) searched and tested for tin, when he should have searched and tested for titanium; (n) offered opinions on products he had never seen or used, let alone tested; (o) included in his testing and comparison analysis a product different from the sealant at issue; (p) conceded that certain of his

opinions did not require an expert; and (q) acknowledged that his test results may not be representative of the sealant products actually used by the Defendants.

Any of these reasons justifies the exclusion of Dr. Willard as an expert witness in this matter; collectively, they overwhelmingly compel such exclusion.

Pursuant to Local Rule 7.1(a), counsel for Dow Corning sought the concurrence of opposing counsel on July 1, 2010, explaining the nature of this Motion and its legal basis; concurrence was not given.

Respectfully submitted,

HOWARD & HOWARD ATTORNEYS PLLC


By: _/s/ Mary C. Dirkes_
      Michael V. Kell (P15805)
      Mary C. Dirkes (P42723)
450 West Fourth Street
Royal Oak, Michigan  48067-2557
(248) 645-1483
Attorneys for Dow Corning Corporation
**mdirkes@howardandhoward.com**

Dated: July 2, 2010

3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DOW CORNING CORPORATION,

      Plaintiff/Counter-Defendant,

vs.

WEATHER SHIELD MANUFACTURING, INC.,
SNE ENTERPRISES, INC. and PEACHTREE
DOORS AND WINDOWS, INC.,

      Defendants/Counter-Plaintiffs.

Case No. 1:09-cv-10429
Hon. Thomas L. Ludington

---

| HOWARD & HOWARD ATTORNEYS PLLC | NANTZ, LITOWICH, SMITH, |
|---|---|
| Michael V. Kell (P15805) | GIRARD & HAMILTON |
| Mary C. Dirkes (P42723) | Mark R. Smith (P33166) |
| Michael O. Fawaz (P68793) | Attorneys for Defendants/Counter- |
| Attorneys for Dow Corning Corporation | Plaintiffs |
| 450 West Fourth Street | 2025 East Beltline, SE, Suite 600 |
| Royal Oak, Michigan  48067 | Grand Rapids, Michigan  49546 |
| (248) 645-1483 | (616) 977-0077 |

---

**BRIEF IN SUPPORT OF
DOW CORNING CORPORATION'S MOTION TO EXCLUDE
THE TESTIMONY, REPORT AND OPINIONS OF DR. G. FRED WILLARD**

# TABLE OF CONTENTS

ISSUES PRESENTED...................................................................................... iv

CONTROLLING AUTHORITY........................................................................ v

INDEX OF AUTHORITIES............................................................................. vi

INTRODUCTION .............................................................................................. 1

STATEMENT OF FACTS ................................................................................. 2

    A.    The Parties/The Sealant Product at Issue..................................... 2

    B.    The Parties' Agreement ................................................................. 3

    C.    The Parties' Claims....................................................................... 4

    D.    Dr. G. Fred Willard ...................................................................... 4

            1.    Dr. Willard's Qualifications............................................... 5

            2.    Dr. Willard's Testing ......................................................... 6

            3.    Dr. Willard's Opinions....................................................... 7

ARGUMENT....................................................................................................... 9

    I.    Standard of Review....................................................................... 9

    II.    Dr. Willard and His Opinions Do Not Satisfy *Daubert* and, Thus, His Testimony, Report and Opinions Should Be Excluded ......................................... 10

            A.    Dr. Willard Is Not Qualified by Training, Education or Experience to Opine About the Suitability of InstantGlaze in the Industry ................. 11

            B.    Dr. Willard's Opinions are Unreliable........................................ 13

                     1.    Dr. Willard Did Not Test InstantGlaze I or II................................ 14

                     2.    Dr. Willard Did Not Test for Weather Shield's Chief Complaint................................................................................ 14

                     3.    Dr. Willard Acknowledges That His Test Results May Not Be Representative of the InstantGlaze Actually Used by Weather Shield.................................................................................. 14

4.      Dr. Willard Concedes the Test Sampling Was Less Than Ideal, and Involved Expired Product ..............................................15

5.      Dr. Willard Performed Tests That He Could Not Interpret or From Which He Could Draw No Conclusions..........................16

6.      Dr. Willard Searched for the Wrong Answers..............................17

7.      Dr. Willard Included Dow Corning's 1199 in His Testing and Analysis Comparison, Which is a Different Product With Different Characteristics .......................................................17

8.      Dr. Willard's Opinions Are Speculative........................................17

9.      Dr. Willard Did Not Independently Verify or Investigate the Facts and Issues........................................................................18

C.      Dr. Willard's Testimony and Opinions Will Not Assist the Trier of Fact..19

CONCLUSION AND RELIEF REQUESTED ...........................................................20

APPENDIX

Exhibit A:      Complaint

Exhibit B:      Expert Report

Exhibit C:      Dr. Willard Deposition Transcript

Exhibit D:      Kenneth Rubis Deposition Transcript Excerpts

Exhibit E:      Steven Block Deposition Transcript Excerpts

Exhibit F:      Cullen Case Deposition Transcript Excerpts

Exhibit G:      January 9, 2006 Email

Exhibit H:      March 22, 2004 Agreement

Exhibit I:      Daniel Nordgren Deposition Transcript Excerpts

Exhibit J:      Robert Gibbons Deposition Transcript Excerpts

Exhibit K:      Aaron Crabb Deposition Transcript Excerpts

Exhibit L:      Technical Report (without testing data)

Exhibit M:      Drum Labels

Exhibit N:      October 8, 2009 Letter from Counsel

## ISSUES PRESENTED

I.     Whether Dr. Willard's testimony, report and opinions should be excluded when Dr. Willard is not qualified to render an expert opinion based upon his lack of requisite knowledge, skill, training and education.

II.    Whether Dr. Willard's testimony, report and opinions should be excluded when Dr. Willard's opinions are unreliable and do not demonstrate sound methodology.

III.   Whether Dr. Willard's testimony, report and opinions should be excluded when Dr. Willard's testimony will not assist the trier of fact.

## CONTROLLING AUTHORITY

1.      The standard for the admissibility of expert testimony is set forth in Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

2.      In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the United States Supreme Court emphasized the trial judge's "gatekeeping" role with respect to expert testimony.

3.      As a threshold examination, a Court must inquire whether a proposed expert witness is qualified to render an opinion. *Isely v. Capuchin Province*, 877 F. Supp. 1055, 1063 (E.D. Mich. 1995).

4.      It is the trial court's responsibility, under F.R.E. 104(a), to make a preliminary finding of fact as to "whether the witness' 'knowledge, skill, experience, training or education' are such as to qualify him or her to testify as an expert at all." *Cook v. American Steamship Co.*, 53 F.3d F.3d 733 (6th Cir. 1995), *abrogated on other grounds, G.E. v. Joiner*, 522 U.S. 136 (1997).

5.      Expert opinion testimony also must be reliable and relevant in order to be admissible. *Cook*, 53 F.3d at 737-738.

6.      Finally, even opinion testimony based on valid scientific or technical knowledge offered by a bona fide expert is still not admissible unless such evidence will "assist the trier of fact." F.R.E. 702; *Cook*, 53 F.3d at 738.

# INDEX OF AUTHORITIES

**Cases**          **Page(s)**

*Berry v. City of Detroit,*
    25 F.3d 1342 (6th Cir. 1994) ...........................................................................12, 13, 19

*Berry v. Crown Equip. Corp.,*
    108 F.Supp.2d 743 (E.D. Mich. 2000)..............................................................10, 11, 12

*Cook v. American Steamship Co.,*
    53 F.3d 733 (6th Cir. 1995), *abrogated on other grounds,*
    *G.E. v. Joiner,* 522 U.S. 136 (1997) ........................................................v, 11, 12, 13, 19

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993)........................................................................................v, 9, 10

*Glaser v. Thompson Medical Co., Inc.,*
    32 F.3d 969 (6th Cir. 1994) ........................................................................................11

*Isely v. Capuchin Province,*
    877 F. Supp. 1055 (E.D. Mich. 1995).........................................................................v, 10

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999).....................................................................................................10

*McLean v. 988011 Ontario, Ltd.,*
    224 F.3d 797 (6th Cir. 2000) .......................................................................................10

*Rice v. Cincinnati, New Orleans & Pacific Ry. Co.,*
    920 F. Supp. 732 (E.D. Ky. 1996) ...............................................................................12

*Saginaw Chippewa Indian Tribe of Michigan v. Granholm,*
    690 F.Supp.2d 622 (E.D. Mich. 2010)........................................................................9, 10

*Smelser v. Norfolk Southern Ry. Co.,*
    105 F.3d 299 (6th Cir. 1997) *abrogated on other grounds,*
    *G.E. v. Joiner,* 522 U.S. 136 (1997) ..................................................................12, 13, 19

*United States v. Thomas,*
    74 F.3d 676 (6th Cir. 1996) *abrogated on other grounds,*
    *G.E. v. Joiner,* 522 U.S. 136 (1997) ............................................................................19

**Federal Court Rules/Rules of Evidence**

F.R.E. 104 ................................................................................................................................10

F.R.E. 702 ............................................................................................................v, 9, 11, 13, 19, 20

## INTRODUCTION

This is a straight-forward breach of contract case in which the breaching parties have admitted liability and the damages owed. Plaintiff loaned Defendants money to purchase certain equipment for use in applying a hot-melt silicone sealant to windows and doors, and Defendants, even though they continue to use the equipment today, refuse to fully repay Plaintiff. To avoid writing a $300,000 check, Defendants countered by claiming that Plaintiff's sealant, purchased numerous times and used with the equipment, is not appropriate for industrial use. Defendants' counterclaim lacks merit, and is the subject of a separate summary judgment motion.

The issue here is the report and purported testimony of Defendants' expert witness; an expert witness who: (a) admittedly is not an expert in silicones; (b) has no education or experience with respect to hot-melt silicone sealants, particularly in window/door manufacturing applications; (c) has never inspected the Defendants' window/door manufacturing lines or processes and, in fact, has never spoken with any of Defendants' representatives other than counsel; (d) has no prior experience with the particular silicone sealant at issue; (e) has never been employed by a window/door manufacturing company; (f) has never been involved in the manufacturing of windows/doors and, in fact, has only once watched windows being manufactured during a sales call - more than two decades ago; (g) has never used the silicone sealant in the application of manufacturing windows/doors; (h) is not knowledgeable regarding an established industry standards organization or its standards; (i) conceded that the sampling of the sealant he tested was less than ideal; (j) "tested" product which was by definition unusable; (k) failed to test for the characteristic that forms the basis of Defendants' primary complaint; (l) performed tests that he could not interpret or from which he could draw no conclusions; (m) searched and tested for tin, when he should have searched and tested for titanium; (n) offered

1

opinions on products he had never seen or used, let alone tested; (o) included in his testing and comparison analysis a product different from the sealant at issue; (p) conceded that certain of his opinions did not require an expert; and (q) acknowledged that his test results may not be representative of the sealant products actually used by the Defendants.

**STATEMENT OF FACTS**

**A.**     **The Parties/The Sealant Product at Issue**

Dow Corning Corporation ("Dow Corning") is a multinational corporation specializing in silicone and silicon-based technology, offering more than 7,000 products and services [Exh. A: Complaint, ¶7].   Weather Shield Manufacturing, Inc., SNE Enterprises, Inc., and Peachtree Doors and Windows, Inc. (collectively, "Weather Shield") are sister companies, all of whom manufacture commercial and residential windows and doors [Id., ¶8].

During the parties' relationship, Weather Shield purchased different silicone sealant products from Dow Corning to be used in Weather Shield's window and door manufacturing processes [Id., ¶11].   Two products, Dow Corning® 1199 and 1166 Silicone Glazing Sealants, are known as room-temperature or cold-applied silicone sealants.   The other product, Dow Corning® InstantGlaze Window Assembly Sealant ("InstantGlaze"), is a silicone reactive hot-melt sealant that is moisture cured.   InstantGlaze is applied with a hot-melt pump that heats the InstantGlaze from a solid state before it is dispersed along the sash of the window or door.   Despite his testing of 1199, InstantGlaze is the only product about which Weather Shield's expert has offered opinions [Exh. B: Expert Report; Exh. C:  Willard dep. tr., pp. 103-104].

InstantGlaze has been approved by the American Architectural Manufacturers Association (AAMA), a group of window manufacturers and various other entities that prescribe a set of specifications for materials used in window manufacturing [Exh. D: Rubis dep. tr., pp.

2

37-38; Exh. E: Block dep. tr., p. 71].

Of significant importance to Weather Shield's counterclaim is the plasticity of InstantGlaze. "Plasticity" measures the amount of movement in a material when stress is applied. If the plasticity is high, the material will be more difficult to compress; conversely, a material with a lower plasticity will be softer and easier to spread [Exh. D: Rubis dep. tr., pp. 29-30]. Dow Corning sold to Weather Shield three different types of InstantGlaze, with differing ranges of plasticity: (1) first, Dow Corning sold InstantGlaze I, with a plasticity range of 0.85 – 1.25 mil, which Weather Shield complained was too hard; (2) Dow Corning then sold  InstantGlaze II, with a plasticity range of 0.60 – 0.85 mil, which Weather Shield complained was too soft; and (3) finally, Dow Corning sold InstantGlaze WS, which Dow Corning lot selected from InstantGlaze I to satisfy a tighter plasticity range (0.85 – 1.10 mil) agreed to by Weather Shield.[1]

Weather Shield does not challenge that InstantGlaze fell within the stated plasticity ranges; rather, Weather Shield complains that the stated plasticity ranges were too broad, purportedly causing too much variability in the product [Exh. C:  Willard dep. tr., p. 168].

**B.    The Parties' Agreement**

On March 22, 2004, Dow Corning and Weather Shield entered into an agreement in which Dow Corning loaned Weather Shield approximately $1 million to purchase 24 Nordson BM-200 Bulk Melter pumps to be used in conjunction with automated XY glazing tables, both of which are necessary for the application of InstantGlaze [Exh. H:  March 22, 2004 Agreement]. In return, Weather Shield agreed to satisfy its silicone sealant needs by purchasing 1199 and

---

[1] Weather Shield initially requested an even tighter range, but Dow Corning told Weather Shield that it could not meet such a range [Exh. F: Case dep. tr., pp. 176-181].  The parties then agreed to a range between .85 – 1.10 mil, which again, was an accommodation by Dow Corning solely for Weather Shield [Exh. G: January 9, 2006 Email].

InstantGlaze for its window and door manufacturing operations through August 31, 2008 [Id.]. Weather Shield further agreed to use only InstantGlaze with the pumps purchased with the money loaned [Id.].

As a means of re-payment for the Nordson pumps loan, the parties agreed that surcharges would be added to the price of the sealant products sold to Weather Shield until payment of the loan had been fully made. If a portion of the equipment loan remained unpaid on December 31, 2007, Weather Shield agreed to pay the remaining balance within 30 days. [Id.].

### C.      The Parties' Claims

Before having fully repaid for the Nordson pumps loan, Weather Shield stopped purchasing Dow Corning's InstantGlaze. Since early 2008, Weather Shield has been using the Nordson pumps with product other than InstantGlaze, in violation of the parties' Agreement as amended [Exh. H: March 22, 2004 Agreement; Exh. I: Nordgren dep. tr., pp. 241-242]. Weather Shield admits there remains $292,559 owing on the balance of the equipment loan [Exh. J: Gibbons dep. tr., p. 10].

Weather Shield claims it does not owe any money, but rather, Dow Corning owes money to Weather Shield for the sale of sealant that Weather Shield claims was unworkable. Weather Shield's main complaint is that it was impossible for Weather Shield to maintain its required tight processing controls in manufacturing because the plasticity of the InstantGlaze varied. Weather Shield did not want to recalibrate or adjust the equipment to accommodate the plasticity of the material, which Weather Shield claimed it had to do [Exh. K: Crabb dep. tr., p. 107].

### D.      Dr. G. Fred Willard

Weather Shield retained G. Fred Willard, Ph.D., from CAS-MI Laboratories ("CAS-MI") as an expert witness in this matter. Dr. Willard offered three opinions in this matter, two

4

regarding plasticity, and a third regarding the alleged failure of InstantGlaze to cure on a sample window sash obtained from a home in Houston, Texas. Dr. Willard's report and his related testimony is remarkable more for what is missing than for what is actually there.

### 1.   Dr. Willard's Qualifications

Dr. Willard has little experience in silicones [Exh. C: Willard dep. tr., p. 64]. Dr. Willard readily acknowledges that while he considers himself an expert in polymers in general, he is not an expert in silicones and, thus, he had to bring himself "up to speed on silicones as best [he] could." [Id., pp. 57-58]. From both an educational and a working experience standpoint, Dr. Willard does not consider himself an expert in silicone chemistry [Id., p. 64].

Likewise, none of Dr. Willard's education relates specifically to sealants and adhesives [Id., p. 65]. While he claims to have working experience at his present lab with respect to sealants and adhesives, Dr. Willard could not recall a specific project involving moisture-cured sealants [Id., pp. 65-66]. He has had no experience at CAS-MI with a silicone-based hot melt adhesive [Id., p. 66]. He has not participated in any project at CAS-MI involving hot-melt with respect to the manufacture of windows or doors [Id., p. 67]. Further, Dr. Willard has no experience at any company at which he worked with hot-melt adhesives or sealants, including silicone-based or otherwise, in window manufacturing applications [Id., pp. 67, 71-72]. He has authored no publications or articles, obtained no patents, nor received any awards, relating to sealants and adhesives in a window manufacturing application [Id., pp. 72-73].

With respect to trials and depositions, Dr. Willard defended mold release chemicals, which, according to Dr. Willard, may, or may not, be considered a sealant [Id., pp. 73-74]. Importantly, that particular case did not involve moisture-cured sealants, silicone-based hot melt adhesives, or the manufacture of windows or doors [Id., p. 74]. Dr. Willard worked with a client

involving treatment for fabric, which "may" have involved a silicone [Id., p. 74]. That case, however, did not involve a moisture-cured sealant or a hot-melt adhesive [Id., pp. 74-75].

With respect to windows, Dr. Willard could only point to his participation as an expert witness in a window failure matter in Florida; that matter, however, related to undercooked resin, and has nothing to do with what Weather Shield is complaining about here [Id., pp. 59-60].

Dr. Willard has never been an employee of a window company [Id., p. 77]. He has never been involved in the manufacturing of windows or doors [Id., p. 78]. He has never viewed windows while being manufactured at any of the Weather Shield facilities [Id., tr., p. 77]. At best, Dr. Willard once watched an unrelated company manufacture windows as part of a marketing pitch sometime back in the 1978-1986 time frame [Id., pp. 77-79].

Before being hired by Weather Shield, Dr. Willard had never heard of InstantGlaze, nor had he tested or analyzed it [Id., p. 79]. He has never tried to use InstantGlaze in the application of manufacturing a window or door [Id., p. 82]. He was not familiar with AAMA [Id., p. 134]. At no time did Dr. Willard talk to anyone at Weather Shield, other than counsel [Id., p. 51].

### 2.    Dr. Willard's Testing

Dr. Willard prepared two reports in this matter: (1) a technical report containing results from tests conducted on certain samples from Weather Shield's counsel [Exh. L: Technical Report (without testing data); Exh. C: Willard dep. tr., pp. 6-7]; and (2) his Expert Report [Exh. B: Expert Report; Exh. C: Willard dep. tr., pp.6-7].

With respect to testing, Dr. Willard did not conduct any tests regarding InstantGlaze's plasticity, even though he knew that is Weather Shield's chief complaint [Id., pp. 23, 103]. Dr. Willard tested another Dow Corning product, 1199. Yet, Dr. Willard has no idea if 1199 was a hot-melt adhesive, nor does he know if the plasticity problems about which Weather Shield

complained and lack of cure involved 1199 [Id., p. 103]. With respect to 1199, Dr. Willard admitted: "I don't know anything about it. I wasn't focused on that. I focused on InstantGlaze." [Id., p. 103-104]. Dr. Willard also tested a sealant sample from a window removed from a home in Houston, Texas [Id., pp. 44, 49].

### 3.    Dr. Willard's Opinions

Dr. Willard generally opines that there are two problems with InstantGlaze: (1) inconsistency with plasticity; and (2) a failure of the product to fully cure at times [Id., p. 103]. With respect to these problems, Dr. Willard offered the following three opinions:

A.    The Dow Corning InstantGlaze I and II products were not appropriate for industrial use.

B.    Variability in the plasticity of the InstantGlaze I and II products resulted in non-uniform and inconsistent bead application leading to field failures.

C.    InstantGlaze I and II failed to completely harden which led to field failures and increased liability of leaky windows in the future.

[Exh. B: Expert Report, pp. 17-19].

A.    With respect to his first opinion, Dr. Willard testified that the speed of processing clearly requires consistent materials: "… it's a no-brainer in that if you are having issues and you are shutting your process down because of the materials changing, you are not fast, you are not going to meet your quota for the day." [Exh. C: Willard dep. tr., p. 96].

Dr. Willard then opined that the InstantGlaze products were not consistent batch to batch and even drum to drum [Exh. B: Expert Report, p. 17]. He purportedly confirmed this variability through a Shore A Hardness test and a FTIR analysis [Id.]. Shore A Hardness tests how much force is required to penetrate a sample [Exh. C: Willard dep. tr., p. 128]. Dr. Willard does not think Weather Shield ever complained about Shore A Hardness [Id., p. 130]. Moreover, although Dr. Willard noted inconsistency in the FTIR analysis, he does not know if that had any

impact on Weather Shield's complaints in this matter and cannot attribute any significance to the purported differences, due to his lack of silicone expertise [Id., p. 100].

Dr. Willard also concluded that if Dow Corning had been able to produce InstantGlaze within a plasticity range of .94 – 1.06, that would have been acceptable for Weather Shield [Id., pp. 90-91]. He based this conclusion solely on Weather Shield's request for this range [Id., p. 90]. He made no independent investigation of what range of plasticity is acceptable, other than what his client said [Id., p. 91].

Shockingly, Dr. Willard did not know that when Dow Corning told Weather Shield that it could not meet the .94 – 1.06 plasticity range, Weather Shield and Dow Corning agreed to a different range [Id., pp. 91-92]. Instead, he thought Weather Shield simply stopped using the product [Id., p. 91]. When told that Weather Shield agreed to a broader range than originally requested, Dr. Willard candidly responded that Weather Shield "made a mistake." [Id., p. 92].

B.      Dr. Willard's second opinion contains two components: (1) when the glaze is too stiff, it will not penetrate into corners leaving voids or too little squeeze out; and (2) when the glaze is too thin, it will squeeze out too much [Exh. B: Expert Report, pp. 18-19]. Dr. Willard's opinions are based on a basic fundamental misunderstanding of plasticity. Dr. Willard believes that the lower the plasticity, the stiffer the product and conversely, the higher the plasticity, the thinner the product [Exh. C: Willard dep. tr., p. 139]. This completely contradicts the facts in this matter – InstantGlaze I, which has a higher range of plasticity, was too stiff for Weather Shield leading to their usage of InstantGlaze II, which has a lower plasticity range.

Dr. Willard also stated that when the glaze bead is too thin, the window glass would sink in too far into the frame and grids on the outside of certain windows would pop off [Exh. B: Expert Report, p. 19]. Dr. Willard, however, has never observed a single case where the grids

8

actually popped off – whether in the field or otherwise [Exh. C: Willard dep. tr., p. 142].  Dr. Willard also knows that there are other causes for pop-off.  Believing that an operator applying an insufficient amount of bead could lead to this same result, Dr. Willard has done nothing to rule out that as a possible source for Weather Shield's complaints [Id., pp. 143-144].

      C.     Dr. Willard based his third opinion regarding the alleged failure to cure on the window he received from Houston [Id., p. 144].  Importantly, Dr. Willard does not opine that InstantGlaze as a product always fails to cure [Id., pp. 147, 158].  He is only claiming it failed in the Houston instance and might fail in others [Id., p. 146].  Dr. Willard has no idea why the material failed [Id., tr., p. 108].  He has no idea when the Houston window was manufactured, when it was sold, when it was installed, or when it allegedly failed [Id., p. 148].  He never spoke with the homeowner [Id., p. 150].  Dr. Willard acknowledged that this alleged failure to cure was unrelated to his other opinions regarding plasticity [Id., pp. 146-147].

## ARGUMENT

## I.    Standard of Review

      The standard for the admissibility of expert testimony is set forth in Federal Rule of Evidence 702.  *Saginaw Chippewa Indian Tribe of Michigan v. Granholm*, 690 F.Supp.2d 622, 634 (E.D. Mich. 2010).  F.R.E. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the United States Supreme Court emphasized the trial judge's "gatekeeping" role with respect to expert

testimony.[2] The proponent of the testimony must establish its admissibility by a preponderance of proof. *Daubert,* 509 U.S. at 592 n. 10. In *Daubert,* the Supreme Court also established guidelines for district courts to use in determining the admissibility of expert evidence under F.R.E. 702 and 104. *Berry v. Crown Equip. Corp.*, 108 F.Supp.2d 743, 748 (E.D. Mich. 2000). The Sixth Circuit, in reliance on *Daubert* and its progeny, also has had many opportunities to provide guidance to trial courts on their gatekeeping duties. For example, an expert's opinion must be supported by "good grounds:"

> An expert's opinion must be supported by 'more than subjective belief and unsupported speculation' and should be supported by 'good grounds,' based on what is known. The expert's conclusions regarding causation must have a basis in established fact and cannot be premised on mere suppositions. An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record.

*McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 800-801 (6th Cir. 2000) (citations omitted).

No matter which guidelines or factors are applied, "the key question remains the same: Does the expert possess 'specialized knowledge' that will aid the trier of fact in determining a fact in issue, and is the proposed testimony the product of sufficient research that was conducted pursuant to reliable methods?" *Saginaw Chippewa Indian Tribe of Michigan,* 690 F.Supp.2d at 635. The answer to this key question here is a resounding "no."

**II.     Dr. Willard and His Opinions Do Not Satisfy *Daubert* and, Thus, His Testimony, Report and Opinions Should Be Excluded**

As a threshold examination, a Court must inquire whether a proposed expert witness is qualified to render an opinion. *Isely v. Capuchin Province*, 877 F. Supp. 1055, 1063 (E.D. Mich.

---

[2] The Supreme Court subsequently announced "that *Daubert's* general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

1995) (qualification of witness by virtue of education and training is "the initial foundational requirement."). Merely proffering a qualified expert, however, is not enough. Once the proposed expert has satisfied the foundational threshold of establishing personal background qualifications as an expert, the expert "must then provide further foundation testimony as to the validity and reliability of his theories." *Berry*, 108 F.Supp.2d at 749.

The expert opinion testimony also must be reliable and relevant. *Cook v. American Steamship Co.*, 53 F.3d 733, 737-738 (6th Cir. 1995), *abrogated on other grounds, G.E. v. Joiner*, 522 U.S. 136 (1997); *Berry*, 108 F.Supp.2d at 749. In order to be deemed reliable, the testimony must be offered by someone qualified by virtue of "knowledge, skill, experience, training, or education," and must relate to "scientific, technical, or other specialized knowledge." F.R.E. 702; *Cook*, 53 F.3d at 738. Finally, even opinion testimony based on valid scientific or technical knowledge offered by a bona fide expert is still not admissible unless such evidence will "assist the trier of fact." F.R.E. 702; *Cook*, 53 F.3d at 738.

Dr. Willard's opinions and proffered testimony are deficient in at least three respects. First, he is not an "expert" qualified to render the opinions he proposes to give in this case. Second, even if qualified, his opinions are unreliable as they are not based on any meaningful verification or test serving as an adequate foundation for such opinion testimony. Third, his opinions will not assist the trier of fact. Any one of these reasons justifies the exclusion of Dr. Willard's report, testimony and opinions; together they compel it.

A.     **Dr. Willard Is Not Qualified by Training, Education, or Experience to Opine About the Suitability of InstantGlaze in the Industry**

"Rule 702 admits expert testimony if the evidence will assist the trier of fact, and if the witness is qualified as an expert." *Glaser v. Thompson Medical Co., Inc.*, 32 F.3d 969, 971 (6th Cir. 1994). It is the trial court's responsibility, under F.R.E. 104(a), to make a preliminary

finding of fact as to "whether the witness' 'knowledge, skill, experience, training or education' are such as to qualify him or her to testify as an expert at all." *Cook*, 53 F.3d at 738 (citation omitted). The *Daubert* "gatekeeping" function mandates "intensive scrutiny" of expert qualifications in addition to scrutiny of proposed scientific theories. *Rice v. Cincinnati, New Orleans & Pacific Ry. Co.*, 920 F. Supp. 732, 736-737 (E.D. Ky. 1996). The trial court must determine whether the expert's training and qualifications relate to the subject matter of the proposed testimony. *Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997), *abrogated on other grounds, G.E. v. Joiner*, 522 U.S. 136 (1997); *Berry*, 108 F.Supp.2d at 749. The court is to examine "not the qualifications of the witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Id.*; *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). A proper foundation for a technical expert demonstrates "firsthand familiarity" with the subject of the testimony. *Berry*, 25 F.3d at 1350.

Here, Dr. Willard does not have the requisite experience to qualify as an expert. Specifically, he lacks "firsthand familiarity" with the use of hot-melt silicone sealants in the manufacture of windows and doors. Nor does he have "firsthand familiarity" with the use of hot-melt silicone sealants in the manufacture of anything. Dr. Willard has no education relating to silicone chemistry, no education relating specifically to sealants and adhesives, and he does not consider himself an expert in silicone chemistry [Exh. C: Willard dep. tr., pp. 64-65].

Dr. Willard's work experience is equally unhelpful. Dr. Willard has no experience at any company using hot-melt adhesives or sealants, silicone-based or otherwise, in window manufacturing applications [Id., pp. 67, 71-72]. He has authored no publications or articles, obtained no patents, nor received any awards, relating to sealants and adhesives in a window manufacturing application [Id., pp. 72-73]. His only testimony regarding window failures had

nothing to do with the issues here [Id., pp. 59-60]. He has never been employed in the industry [Id., p. 77]. He has never manufactured a window or door; he has never watched Weather Shield manufacture a window or a door, or anyone else, with one exception 20 years ago [Id., pp. 77-79]. He also has never used InstantGlaze in the manufacture of a window or door [Id., p. 82].

While attempting to opine on the appropriateness of InstantGlaze in the industry, Dr. Willard has never heard of AAMA, a recognized industry standards organization [Id., p. 134]. He does not know if AAMA approved InstantGlaze [Id., p. 134]. With respect to other window manufacturers, Dr. Willard has no idea if others use InstantGlaze [Id., p. 136]. Remarkably, he has made no inquiry or investigation of the use of InstantGlaze in the industry [Id.]. Dr. Willard also agrees that he has no firsthand knowledge of the effect that a given range of plasticity may have on the window manufacturing process [Id., p. 124].

Dr. Willard is not an industry expert and falls far short of possessing "firsthand familiarity" with InstantGlaze and its use in the industry. *See Berry*, 25 F.3d at 1350. By his own deposition testimony, Dr. Willard demonstrates that he does not possess the requisite "knowledge, skill, experience, training, or education" to render expert opinions regarding InstantGlaze or its use in the industry. *See* F.R.E. 702.

**B.      Dr. Willard's Opinions Are Unreliable**

Even if Dr. Willard is preliminarily qualified by education or experience to render expert opinions in this case, Weather Shield cannot satisfy its burden of demonstrating that Dr. Willard's testimony is reliable. *See Smelser*, 105 F.3d at 303. Reliability has been described as the "first and universal requirement" for the admissibility of expert opinion evidence. *Cook*, 53 F.3d at 737. In assessing reliability, the trial court must focus on the "soundness of the expert's methodology." *Smelser*, 105 F.3d at 303.

### 1.     Dr. Willard Did Not Test InstantGlaze I or II

Although each of Dr. Willard's opinions relate to InstantGlaze I and II, he never even tested, let alone viewed, these products.  Instead, Dr. Willard tested InstantGlaze WS, the lot-selected InstantGlaze ultimately agreed upon by the parties [Exh. M: Drum labels from Dr. Willard's file, dep. ex. 4; Exh. C: Willard dep. tr., pp. 12-13].[3]  Consequently, Dr. Willard's methodology is wholly unreliable.

### 2.     Dr. Willard Did Not Test for Weather Shield's Chief Complaint

Dr. Willard claims he could not conduct a plasticity test because it was an internal Dow Corning test, and he did not have any wet samples [Exh. C: Willard dep. tr., p. 23].  He further testified, however, that if he had new material as a control with a stated plasticity value, he could have adjusted conditions in his lab until he obtained the stated value.  From there, he could analyze the samples provided by Weather Shield. [Id., pp. 24-25].  Dow Corning offered to provide sealant samples so that Dr. Willard could conduct any tests he believed relevant [Exh. N: October 8, 2009 letter from counsel, Willard dep. ex. 5]. Thus, Dr. Willard deliberately elected not to test for plasticity, even though he knew it is Weather Shield's chief complaint. Dr. Willard's inexplicable decision reflects a poor methodology on his part.

### 3.     Dr. Willard Acknowledges That His Test Results May Not Be Representative of the InstantGlaze Actually Used by Weather Shield

Dr. Willard claims it was critical to test samples from barrels that Weather Shield had on hand and that did "not work." Dr. Willard confirmed with Weather Shield's counsel that "these barrels were ones that didn't work and were set aside; that's the reason he had them at all."

---

[3] Dr. Willard's file was marked as three separate exhibits during his deposition; individual pages within each exhibit were not marked.

[Exh. C: Willard dep. tr., p. 35]. According to Dr. Willard, it made no sense to test new samples because it would not tell you what was occurring during the relevant time frame [Id.].

This same logic renders all of Dr. Willard's testing irrelevant, and calls into question the validity of his conclusions. If testing data from current samples of InstantGlaze is irrelevant when assessing what occurred when Weather Shield was using InstantGlaze, it is equally irrelevant to test samples of InstantGlaze that Weather Shield supposedly could not work with, since Weather Shield was in fact able to work with every other barrel of InstantGlaze. Indeed, Dr. Willard concedes that he has no way of knowing whether the testing data in his report from the three "bad" barrels is indicative of testing data that he would have obtained had he tested every other barrel of InstantGlaze that Weather Shield used [Id., pp. 174-177]. In fact, Dr. Willard agrees that it is possible that the three barrels were so "bad," that none of the other barrels Weather Shield used would have the same testing characteristics [Id., p. 177].

### 4. Dr. Willard Concedes the Test Sampling Was Less Than Ideal, and Involved Expired Product

Dr. Willard concedes that Weather Shield's method for extracting the samples from the barrels was suspect; again casting serious doubt over his testing methodology. Typically, Dr. Willard wants samples from the top, middle and bottom of the barrel. If one picks up the barrel and pours something out of it, the material will "slosh around," thus potentially destroying any layers. To avoid this from occurring, Dr. Willard instructed Weather Shield to jam a piece of electrical conduit into each barrel. If done properly, the material at the top of the barrel should push to the top of the conduit, the middle layer should be reflective of the middle of the barrel, and the bottom should be material from the bottom of the barrel. [Id., pp. 28-29]. Dr. Willard concedes, however, that this sampling method was "not a perfect science." [Id., pp. 33-34]. Moreover, Weather Shield could only extract such sampling from the barrel containing 1199.

The InstantGlaze material in the other two barrels was too hard and thus, the material would not flow into the conduit. As a result, Dr. Willard "thought" that samples may have collected on the outside of the conduit and Weather Shield "probably" left it there and pulled the conduit out as fast as possible. [Id., pp. 29-31]. Regarding this modified sampling, Dr. Willard concedes the sampling was even less perfect [Id., p. 34].

Dr. Willard noted that one would expect the Shore A Hardness value to be higher on the samples taken from the top of the drum due to the fact that InstantGlaze is a moisture-cure product and the top of the barrel would be exposed to more moisture [Id., p. 191]. Despite obtaining inverted testing values, he stubbornly refused to find anything wrong with his less than ideal product samplings [Id., p. 192].

Dr. Willard had no idea how Weather Shield had been storing the barrels [Id., p 38]. He never saw the barrels or even a picture of the barrels [Id., p. 40]. Dr. Willard did acknowledge, however, that due to the passage of time, the samples he tested were most likely out of shelf life [Id., p. 36]. He did not believe that such expired material would impact his Shore A Hardness testing, but it may have impacted the FTIR analysis [Id., pp. 36-37].

### 5.    Dr. Willard Performed Tests That He Could Not Interpret or From Which He Could Draw No Conclusions

Dr. Willard conducted a Modulated DSC test, the purpose of which was to determine degree of cure. After the test, however, Dr. Willard realized he could not utilize the data for cure purposes because he is not an expert in silicone chemistry [Id., pp. 185-188]. Instead, Dr. Willard could only deduce that there was some contamination in the window from Houston but even then, he had no idea what effect, if any, the contamination may have had [Id., p. 188].

While Dr. Willard noted that there appeared to be differences in the FTIR/ATR data, he could not opine as to whether such purported differences were significant because he is not an

expert in silicone; nor could he opine what impact, if any, such differences may cause [Id., pp. 157, 182]. Nevertheless, he relied on the FTIR analysis in opining that the InstantGlaze products were not consistent from batch to batch [Exh. B: Expert Report, p. 17].

### 6. Dr. Willard Searched for the Wrong Answers

Dr. Willard's lab determined that the 1199 sample contained tin, and yet, the InstantGlaze samples did not. According to Dr. Willard, the lack of tin may explain why the InstantGlaze on the Houston window did not harden. [Exh. C: Willard dep. tr., p. 158]. Dr. Willard completely overlooked the fact that Dow Corning uses a titanium catalyst in InstantGlaze as opposed to tin [Id., p. 159; Exh. E: Block dep. tr., p. 97]. In other words, due to his misunderstanding of the product, and an improper comparison to 1199, Dr. Willard searched for something that was not there, further demonstrating the flaws in his testing methodology.

### 7. Dr. Willard Included Dow Corning's 1199 in His Testing and Analysis Comparison, Which is a Different Product With Different Characteristics

Dr. Willard offers no opinions regarding 1199. Yet, when comparing the InstantGlaze range of Shore A hardness values, Dr. Willard included the low number for 1199. During his deposition, Dr. Willard admitted this was a "mistake;" and that it "shouldn't be in there." [Exh. C: Willard dep. tr., p. 104]. Thus, Dr. Willard admitted his testing methodology was unsound.

### 8. Dr. Willard's Opinions Are Speculative

Relying on the Houston window, Dr. Willard opined that inconsistency in the InstantGlaze led to the need for constant manual adjustments to the processing line, which led to testing and field failures [Id., pp. 112-114; Exh. B: Expert Report pp. 17-18]. Dr. Willard further admitted, however, that he does not know the history of the window so he cannot definitively correlate the adjustments being made to a field failure [Exh. C: Willard dep. tr., p. 114].

**9.     Dr. Willard Did Not Independently Verify or Investigate the Facts and Issues**

Dr. Willard did not talk to anyone at Weather Shield, other than in-house and outside counsel [Id., p. 51]. His knowledge of the underlying facts in this matter is based solely on the facts that counsel spoon fed him [Id., p. 55]. He read only one Weather Shield deposition, and was not provided copies of the two Dow Corning fact depositions [Id.]. Dr. Willard did not independently verify any of the facts or issues, choosing instead to rely only on documents selected for him by counsel [Id., p. 56].

At no time did Dr. Willard personally observe any issues that Weather Shield complained about relating to InstantGlaze [Id., p. 81]. Indeed, Dr. Willard has never even been to any of the Weather Shield facilities [Id.]. Consequently, he has never seen the application of InstantGlaze in Weather Shield's manufacturing processes [Id., pp. 81-82].

Dr. Willard cannot rule out other causes for Weather Shield's alleged problems which have nothing to do with the variability of InstantGlaze's plasticity - such as equipment-related problems and operator errors [Id., pp. 82-86]. And, while Dr. Willard assumed the Weather Shield operators were well-trained, he did not confirm the capabilities of the operators [Id., p. 86]. Dr. Willard also acknowledged that insufficient bead size could lead to failures, yet he never investigated the amount of bead Weather Shield used [Id, pp. 114-116]. Despite opining that the use of InstantGlaze led to more material cost, equipment cost and testing costs, he has no idea if Weather Shield benefited from a cost-savings standpoint by using InstantGlaze [Exh. B: Expert Report, p. 18; Exh. C: Willard dep. tr., p. 88].

It is impermissible and unfair to permit Dr. Willard, without independent verification and investigation, to simply reiterate Weather Shield's claims under the cloak of an expert. Dr. Willard's testing methodology is suspect and full of gaping holes, leading to more questions than

answers. Dr. Willard's methodology fails to demonstrate the soundness required of an expert, and thus, Dr. Willard's opinions should be excluded. *See, Smelser*, 105 F.3d at 303.

### C.   Dr. Willard's Testimony Will Not Assist the Trier of Fact

Expert testimony is admissible only if it will assist the trier of fact. F.R.E. 702. Courts have framed the inquiry as "whether expert testimony improperly addresses matters within the understanding or common knowledge of the average juror or invades the province of the jury." *United States v. Thomas*, 74 F.3d 676, 684 n. 6 (6th Cir. 1996), *abrogated on other grounds, G.E. v. Joiner*, 522 U.S. 136 (1997). For example, in *Cook*, the Court reversed the trial court's decision to admit expert testimony because the expert's only testing involved a visual examination of "the line at the place where it parted and observed some char marks on some of the fibers; that much the jurors could have done, and presumably did do." *Cook*, 53 F.3d at 739; *see also Berry*, 25 F.3d at 1350 ("If everyone knows [something], then we do not need an expert because the testimony will not 'assist the trier of fact to understand the evidence or to determine a fact in issue.'") (citation omitted).

Dr. Willard's testimony cannot be considered expert testimony. His opinions are premised on limited facts he read from documents provided by Weather Shield's counsel. Dr. Willard never verified the facts, never spoke directly with the Weather Shield employees who used the InstantGlaze, and never fully investigated the situation involving the Houston residence [Exhibit C: F. Willard dep. tr., pp. 108, 148, 150]. He has no knowledge of InstantGlaze, other than the few inconclusive tests he performed. He has not investigated the industry's use of InstantGlaze.

Despite his criticism of the variability in plasticity, Dr. Willard admits he has no firsthand knowledge of the effect a given range of plasticity may have on the manufacturing process [Id., p. 124]. Instead, he "can only rely on the information that was provided to [him]." [Id.].

Dr. Willard described a certain statement as a "no-brainer" [Id., p. 96]. Similarly, with respect to his opinion regarding the failure of the Houston window to fully cure, he openly conceded that expert testimony is not necessary. All Dr. Willard tried to show was that there was something wrong with the window. He agreed that anyone off the street could look at the window and realize that something was wrong. One does not need to be an expert to render that opinion. [Id., p. 196]. If expert testimony will not be of any assistance, as it would not be here, the jury should be permitted to reach its own conclusions. F.R.E. 702.

## CONCLUSION AND RELIEF REQUESTED

Dr. Willard is not qualified to serve as an expert witness in this matter. He lacks the education, training and experience to opine about InstantGlaze and its application in the manufacture of windows and doors. His testimony is unreliable; his testing methodology unsound. Dr. Willard's testimony will not assist the trier of fact as he has done nothing more to reach his opinions than the jury could, and presumably will, do. Accordingly, this Court should not allow Dr. Willard to serve or testify as an expert witness in this matter. For these reasons, Dow Corning requests that the Court exclude the testimony, report and opinions of Dr. Willard.

Respectfully submitted,

HOWARD & HOWARD ATTORNEYS PLLC

By: _/s/ Mary C. Dirkes_
     Michael V. Kell (P15805)
     Mary C. Dirkes (P42723)
450 West Fourth Street
Royal Oak, Michigan  48067-2557
(248) 645-1483
Attorneys for Dow Corning Corporation
**mdirkes@howardandhoward.com**

Dated: July 2, 2010

20

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DOW CORNING CORPORATION,

        Plaintiff/Counter-Defendant,

vs.

WEATHER SHIELD MANUFACTURING, INC.,
SNE ENTERPRISES, INC. and PEACHTREE
DOORS AND WINDOWS, INC.,

        Defendants/Counter-Plaintiffs.

Case No. 1:09-cv-10429
Hon. Thomas L. Ludington

| HOWARD & HOWARD ATTORNEYS PLLC | NANTZ, LITOWICH, SMITH, |
|---|---|
| Michael V. Kell (P15805) | GIRARD & HAMILTON |
| Mary C. Dirkes (P42723) | Mark R. Smith (P33166) |
| Michael O. Fawaz (P68793) | Attorneys for Defendants/Counter-Plaintiffs |
| Attorneys for Dow Corning Corporation | |
| 450 West Fourth Street | 2025 East Beltline, SE, Suite 600 |
| Royal Oak, Michigan 48067 | Grand Rapids, Michigan 49546 |
| (248) 645-1483 | (616) 977-0077 |

## CERTIFICATE OF SERVICE

       Mary C. Dirkes, undersigned attorney for Plaintiff/Counter-Defendant, Dow Corning Corporation, certifies that on July 2, 2010, I electronically filed ***Dow Corning's Motion to Exclude the Testimony, Report and Opinions of Dr. G. Fred Willard*** and its ***Brief in Support*** and this ***Certificate of Service*** using the ECF system, which will send notification of such filing to Mark R. Smith and any other counsel of record.

               Respectfully submitted,

               HOWARD & HOWARD ATTORNEYS PLLC

               By: */s/ Mary C. Dirkes*
                  Michael V. Kell (P15805)
                  Mary C. Dirkes (P42723)
               450 West Fourth Street
               Royal Oak, Michigan 48067-2557
               (248) 645-1483
               Attorneys for Dow Corning Corporation
Dated: July 2, 2010          **mdirkes@howardandhoward.com**

21