UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DOW CORNING CORPORATION,

    Plaintiff/Counter-Defendant,

v.

Case Number 09-10429
Honorable Thomas L. Ludington

WEATHER SHIELD MANUFACTURING, INC.,
SNE ENTERPRISES, INC., and PEACHTREE
DOORS AND WINDOWS, INC.

    Defendants/Counter-Plaintiffs.
_____/

## **OPINION AND ORDER DIRECTING SUPPLEMENTAL BRIEFING**

On February 4, 2009, Plaintiff Dow Corning Corporation ("Dow Corning" or "Plaintiff") filed a complaint against Weather Shield Manufacturing, Inc., SNE Enterprises, Inc, and Peachtree Doors and Windows, Inc. (collectively, "Weather Shield" or "Defendants") alleging breach of contract and unjust enrichment [Dkt. #1]. Plaintiff alleges that it entered into an enforceable letter agreement with Defendants on March 22, 2004, which Defendant breached by failing to repay Plaintiff for a loan made to purchase glazing equipment, for failing to purchase Plaintiff's silicone sealant known by its trade name of "InstantGlaze," for its window and door manufacturing operations until August 31, 2008, and for using the glazing equipment with a product other than Plaintiff's. Plaintiff also alleges that Defendants have been unjustly enriched by using the glazing equipment without having fully paid Plaintiff.

Weather Shield filed a counterclaim on February 27, 2009 [Dkt. #9] acknowledging that it had not repaid the loan but claiming a setoff because the sealant furnished by Dow Corning did not comply with Dow Corning's express warranty or its warranty of fitness for a particular purpose. Its

chief complaint was that it was impossible to maintain its required tight processing controls during manufacturing when the plasticity of the InstantGlaze varied, requiring recalibrating or adjusting the equipment to accommodate the plasticity of the material. Weather Shield's alleged damages total $402,844.22 and are based on Erdman pump failures ($94,458.04), the Portside Builder's claim ($51,129.75), cap beading ($37,339.17), additional support material ($119,835), additional cost to purge lines ($7,311.20), cap beading in the field ($84,995.04), and lost amortization with respect to 1199 ($7,776).

Dow Corning filed a motion for summary judgment on July 2, 2010 [Dkt. #23] contending that Weather Shield has admitted the remaining contract balance owed to Dow Corning, Weather Shield's counterclaim is barred because the parties' agreement did not include an express warranty or implied warranty and that even if it did, any implied warranty was disclaimed, and that Weather Shield is not entitled to damages due to its spoliation of evidence, its failure to give proper notice, and its failure to connect its asserted damages to the sealant product at issue. Weather Shield filed a response on August 13, 2010 [Dkt. #28]. Its response primarily focuses on their counterclaim and Weather Shield's contention that the counterclaim presented unresolved issues of fact for a jury. Plaintiff filed a reply on August 23, 2010 [Dkt. #29].

**I**

**A**

Dow Corning specializes in the manufacture of silicone products. Defendants are sister companies, all of whom manufacture commercial and residential windows and doors. During the parties' relationship, Weather Shield purchased different silicone sealant products from Dow Corning to be used in Weather Shield's window and door manufacturing process. Two products,

Dow Corning 1199 and 1166 Silicone Glazing Sealants, are known as room-temperature or cold-applied silicone sealants. The other product, Dow Corning InstantGlaze Window Assembly Sealant ("InstantGlaze"), is a silicone reactive hotmelt that is moisture cured. InstantGlaze is applied from five gallon pails or 55 gallon drums with a hot-melt pump that heats the InstantGlaze from a solid state before it is dispersed along the sash of the window or door.

InstantGlaze is applied between the glass and frame of windows and doors and serves to not only hold the glass in place during assembly but to prevent water from leaking around the glass into or through the window or door frame. InstantGlaze replaces glazing tape which had traditionally been used to hold the glass in place during the assembly process. InstantGlaze is applied using either automated or hand assisted glazing equipment which heats the product and uses a pump to place the InstantGlaze within the window or door frame. Dow Corning advertised the InstantGlaze as providing many benefits to Weather Shield including:

- Compatible with most insulating glass sealants
- Combines the precise, high-speed application and long-term performance benefits of automated silicone wet glazing with the instant adhesion benefits of double-sided tape
- Automated application reduces time and labor costs and creates a uniform seal that contributes to consistent window performance
- One-part convenience and long pot life offer processing flexibility
- Primerless adhesion to most substrates saves time and money
- Instant green strength enables window to move seamlessly from one processing step to the next with no hold time; units can be handled without risk of compromising the integrity of the seal, eliminating the need to maintain a holding zone for storing the sashes until they build sufficient handling cure
- Reasonable working time allows glass to be adjusted after it has been set, eliminating material waste
- High viscosity at room temperature virtually eliminates squeeze-out- minimizes sealant waste and cleanup, thereby reducing material and labor costs.

Weather Shield investigated the potential use of the InstantGlaze product as early as September 2002 when it was provided product literature and information by Dow Corning regarding

the features and benefits of the product. The product literature and information included: Silicone Hot Melt Preliminary Product Information and Attributes; Benchmarking Data for Silicone Hot Melt - 180 Peels and Lap Shear; Peel Adhesion Green Strength Comparison; Lap Shear Green Strength Comparison; and Sealant Material Safety Data Sheet. (Def.s' Resp. to Pl.'s Mot. for Summ. J. Ex. 2.) Weather Shield, working with Dow Corning, set up a test to view application of the material utilizing automated assembly equipment. On January 15, 2003, the parties conducted a trial examination of the material and equipment. Weather Shield's Executive Vice President, Director of Manufacturing, Purchasing Manager, Plant Engineering Manager, Plant Manager, and an Industrial Engineer attended the trial. Attending the trial from Dow Corning were Steve Block, Ross Noel, Doug Kempf, Dave Talcott, Randy Johnson, and Cullen Case. (*Id.* Ex 3.)

The objective of the trial was to demonstrate the capability of InstantGlaze and the associated application equipment, more specifically the Wegoma table and Nordson pump. Weather Shield wanted to determine if the InstantGlaze and associated equipment would be an acceptable solution to convert their then-PVC window production from the current tape and silicone backbedding system to InstantGlaze. Weather Shield's needs included creating a finish gap of 1/16" between the glass and sash, the product having instant green strength and ensuring no squeeze out or clean up. Weather Shield ran application tests and found that the equipment was unable to reach the appropriate bead diameter at the desired output rate, but noted in the customer trial summary that nothing in the results was unusual after the material was purged from the system, which took nearly thirty minutes to flush. Weather Shield found that the system would need to be flushed with 200FL when components in the bulk melter system were changed and that lubricants and/or fluids were typically present that routinely discolored the InstantGlaze. (*Id.* Ex. 3.) Weather Shield's trial

summary notes reflect that the green strength of InstantGlaze was tested and that the squeeze out was greater than 1/32" by 1/24.

Upon completion of the testing, Weather Shield concluded that if it was going to move forward with the product, it would do so utilizing an automated table manufactured by Erdman Automation which was an equipment vendor approved by Dow Corning for the application of the InstantGlaze products. Weather Shield also met with representatives of Nordson, another approved vendor, which manufactured the bulk melter equipment used to heat the InstantGlaze so that it would flow onto the surface of the windows or doors being assembled. While it was exploring equipment, Weather Shield extensively tested the InstantGlaze product and developed guidelines for use of the product in its assembly process which was shared with Dow Corning. (Def.s' Resp. to Pl.'s Mot. for Summ. J. Ex. 8.) In July 2003, Weather Shield advised Dow Corning that it wished to move forward with the InstantGlaze product and the automated assembly process.

Dow Corning sent a draft letter agreement to Weather Shield on October 13, 2003, reflecting Weather Shield's agreement to purchase all of its silicone sealant requirements for its window and door manufacturing operations through August 31, 2008. (Def.s' Resp. to Pl.'s Mot. for Summ. J. Ex. 10.) Exhibit A to the letter agreement contained the general terms and conditions of the sale, including Dow Corning's disclaimer of suitability of the products purchased and a limited remedy. Weather Shield's response to these items included the comment "[n]o way." (*Id*.) The specific terms and conditions Weather Shield objected to were contained in the "End Use," "Limited Warranty," and "Remedy" provisions of the general terms and conditions of sale. The End Use provision provided that

> Dow Corning shall have no responsibility in connection with determining the suitability of the Products purchased for the use contemplated by Buyer. Such

> determination is the sole responsibility of the Buyer and Buyer assumes all risk and liability for loss, damage, or injury to property out of the use or possession of the Products furnished under this Agreement.

(*Id.*) The Limited Warranty provision provided, in relevant part, that "Dow Corning disclaims all express or implied warranties, merchantability, or fitness for a particular purpose." (*Id.* (original in capitals).) The Remedy provision provided, in relevant part, that the

> Buyer's exclusive remedy and Dow Corning's sole responsibility for any claim or cause of action (unintelligible) this Agreement is expressly limited to either (1) replacement or refund of the purchase price of all Products shown to be other than as warranted or (2) payment not to exceed the purchase price of the specific Product for which damages are claimed. Any refund or replacement is conditioned on Buyer giving Dow Corning notice within 90 days from the date of shipment that the Products are other than as warranted. Failure to give notice within 90 days shall constitute a waiver by Buyer of all claims under this Agreement with respect to the Products.

(*Id.*)

On October 22, 2003, Weather Shield's representative, Bob Gibbons, communicated in an email discussing the letter agreement that Item 1 (End Use), Item 2 (Limited Warranty), and Item 3 (Remedy) of the general terms and conditions were unacceptable and that the reimbursement and time frames provided in Item 3 were also not acceptable. (*Id.* at Ex. 11.) Weather Shield also found the time frames in Item 11 - Commencement unacceptable and explained that because InstantGlaze was a new product, more time was needed to gauge the field performance. (*Id.*) On November 6, 2003, Dow Corning advised that Exhibit A Items 1, 2, and 3 would be "difficult to move away from" and asked for additional clarification as to Weather Shield's objections in order to conclude negotiations on the agreement. (*Id.* Ex. 12.) Weather Shield responded that under Item 1 - End Use and Item 2 - Limited Warranty it "makes no sense" for Dow Corning to be selling the product as a bedding/glazing compound but wanting to claim no responsibility for it being used in that manner.

(*Id*.) Regarding Item 3 - Remedy Weather Shield explained that the limited time frame to report that the product was other than warranted and the reimbursement for the product alone were unacceptable because InstantGlaze was a new product. (*Id*.)

Dow Corning then sent a revised letter agreement to Weather Shield on November 24, 2003, which was signed by the parties. This agreement did not contain any of the prior information included in the October 13, 2003, Exhibit A general terms and conditions of the sale. Instead, the only exhibit to the November 24, 2003 agreement referenced an equipment warranty disclaimer and a limitation of liability for damages involving the operation of equipment. The revised letter agreement also excluded the earlier warranty disclaimer or limitation of liability as to the silicone sealant products.

On March 22, 2004, Dow Corning and Weather Shield entered into a fourth agreement ("the March 22, 2004 Agreement") in which Dow Corning loaned Weather Shield approximately $1 million to purchase twenty four Nordson BM-200 Bulk Melter pumps (the "Nordson Pumps") to be used in conjunction with automated XY glazing tables, both of which are necessary for the application of InstantGlaze. In return, Weather Shield agreed to satisfy its silicone sealant needs by purchasing 1199 and InstantGlaze (the "Sealant Products") for its window and door manufacturing operations through August 31, 2008, at specified prices. This agreement provided that the Sealant Products were being supplied per the specifications and data sheets that are current at the time of shipment, and contained the similar equipment warranty disclaimer and limitation of liability for any damages involving the equipment but did not contain a warranty disclaimer or limitation of liability as to the silicone sealant products.

As a means of repayment for the Nordson Pump loans, the parties agreed that certain

surcharges would be added to the price of the Sealant Products sold to Weather Shield until payment of the loan had been fully made. Each year, Dow Corning would assess the volume purchased the prior year and the surcharge paid. If at the end of a year, the repayment level contemplated in the March 22, 2004 Agreement had not been met, Weather Shield agreed to make a lump sum payment to bring repayment up to an expected level. If a portion of the equipment loan remained unpaid on December 31, 2007, Weather Shield agreed to pay the remaining balancing within thirty days.

The parties' agreement also provided that the Nordson Pumps became the property of Weather Shield upon delivery of the equipment. Weather Shield was responsible for performing routine and preventative maintenance as recommended by the manufacturer and for keeping the equipment in proper operating condition. Dow Corning disclaimed any express or implied warranties or representations regarding the equipment. Nordson was responsible for fulfilling any warranty requirements on the pumps, and Weather Shield also agreed that the Nordson Pumps would be solely used with Dow Corning InstantGlaze until the equipment cost had been repaid.

In 2005, the parties re-negotiated the annual volume and loan repayment schedule of their agreement. Under this amendment, Dow Corning extended the original payback period on the interest free loan for one year until 2008.

**B**

Weather Shield brought a counterclaim against Dow Corning on February 27, 2009 [Dkt. # 9]. According to the counterclaim, before entering into the agreement to purchase InstantGlaze and the 1199 Silicone Glazing Sealant (the "Sealant Products") from Dow Chemical, Weather Shield met with Dow Corning's authorized representatives who reviewed Weather Shield's product lines and assembly methods to become familiar with not only the types of products on which the Sealant

Products would be used but also the assembly process. (Counterclaim ¶ 9.) Based on this review, Weather Shield alleges generally that Dow Corning's representatives recommended the Sealant Products, the Nordson bulk melter units, and XY glazing tables. (*Id*. ¶ 10.) Weather Shield further alleges that unidentified Dow Corning representatives also warranted that the Sealant Products would meet Weather Shield's needs in its window and door assembly; that its products would meet Weather Shield's needs with respect to peel adhesion strength to vinyl, polyuerthane painted aluminum, clear glass, preservative treated wood and preservative treated millwork primer coated wood utilized in the construction of windows and doors; and that the Sealant Products would have appropriate green strength to allow handling during the manufacturing process, would provide uniform glazing, and would have suitable "open times" during the manufacturing. (*Id*.)

Weather Shield contends that Dow Corning's products did not perform as represented. (*Id*. ¶ 14.) This allegedly led to significant damages due to expenses related to reimbursements made to customers for damages caused by glazing leaks, manufacturing costs to cap bead product, additional field services expenses to cap bead product in the field to remedy glazing leaks, maintenance costs to replace or repair the Nordson units damaged through using the Sealant Products, labor and material costs to add shims to the window and door products that would have otherwise been unnecessary, and the cost of cover relating to the necessary replacement of the Sealant Products. (Id. ¶ 15.)

Weather Shield's response to Dow Corning's motion for summary judgment is primarily focused on their counterclaim for breach of express and implied warranty of fitness for a particular purpose and the events that post date the agreements. Weather Shield contends that the plasticity of InstantGlaze was too variable. Plasticity measures the amount of movement in a material when

stress is applied. If the plasticity is high, the material will be more difficult to compress whereas a material with a lower plasticity will be softer and easier to spread. Dow Corning sold Weather Shield three different types of InstantGlaze, with differing ranges of plasticity. First, Dow Corning sold InstantGlaze I with a plasticity range of 0.85 to 1.25 mil. Second, Dow Corning sold InstantGlaze II, with a plasticity range of 0.60 to 0.85 mil. Weather Shield found InstantGlaze I to be too hard, and InstantGlaze II to be too soft. Finally, Dow Corning sold InstantGlaze WS, which was selected from batches of InstantGlaze I which fell within the tighter plasticity range of 0.85 to 1.10 mil requested by Weather Shield near the end of 2005 after Weather Shield had tested and used the InstantGlaze product for almost two years. (Def.s' Resp. to Pl.'s Mot. for Summ. J. Ex. 26-29.) Weather Shield's request made in late 2005 was initially for an even tighter range, but Dow Corning could not meet such a request. The agreed-upon plasticity range of InstantGlaze WS was an accommodation by Dow Corning specifically for Weather Shield. The plasticity information was generally provided to Weather Shield on a certificate of analysis delivered with batches of product that had been divided into drums.

According to Weather Shield, InstantGlaze did not conform to the warranties it had expressly received or that could reasonably be implied from Dow Corning's unique knowledge of their products and Weather Shield's application of the products. The InstantGlaze had green strength issues. The glass would slide after placement and the shear strength would not hold the weight of the glass, requiring a massive number of shims to hold it in place which created increased production costs beginning in 2005. Thus the promise of eliminating holding time during the manufacturing process and allowing seamless movement from step to step in the process was unfulfilled. More problematic was the high range of variability in plasticity. On one end of the range it was very stiff

and could not be compressed enough between the glass and the window or door frame so that leaks would occur in voids in the material and the glass would sit too high in the frame, causing assembly problems. The rigidity of InstantGlaze I led Weather Shield to request testing for and its engineers approving the use of InstantGlaze II in September 2005. (Pl.'s Mot. for Summ. J. Ex. U.) InstantGlaze II, however, was on the other end of the range of plasticity with the material being too soft causing it to flatten to the point where there was little or nothing for the glass to adhere into the frame and causing the glass to sit too low or deep in the frame resulting in assembly problems. Weather Shield then began working with Dow Corning in January 2006 to provide a tighter plasticity range with InstantGlaze WS, which Weather Shield then agreed was acceptable. (*Id.* Ex. E.)

Compounding the problem was the wide range of variability within the same category of product, making it difficult to apply consistent bead size because "wet out"[1] would change with different plasticity. This necessitated hand applying another bead of silicone on the top of the glass, which is called "cap beading," to prevent leaks through gaps in the beads. The wet out variability created issues with clean up because wet out would vary and material would get on the open surface of the glass. Because of this, Weather Shield would have to adjust for the variability in plasticity by changing the temperature applied to the material, the bead size and location and other operating parameters so that each barrel of the material required its own set up and sometimes even required changes within a barrel. A change in plasticity changes the mechanical properties of the InstantGlaze such as tensile and green strength, and also impacts the viscosity of the materials so that using a

---

[1]"Wet out" is the horizontal movement of the bead of material after it is put in compression between the glass and the frame. Def.s' Resp. to Pl.'s Mot. for Summ. J. Ex. 25 p. 3.

constant application temperature will result in more or less viscosity during the application process. The viscosity impacts how the material flows when being applied and can also impact the size of the bead of material being applied.

Weather Shield requested a tighter range of plasticity, but Dow Corning advised it could not meet this request and the parties agreed to a broader range they thought could work for Weather Shield's needs: InstantGlaze WS. To accomplish this, Dow Corning selected barrels from its production that fell within the agreed range of 0.85 to 1.10. Dow Corning agreed to label each drum with the specific plasticity but instead reverted to simply representing the material fell within the stated range. Certificates of Analysis were sent with each shipment, typically showing the plasticity of the batch which consisted of numerous drums of the material.

However, the customized range did not work for Weather Shield because it still required too much adjustment of Weather Shield's manufacturing process. In addition to the manually applied cap beading and shim use, Weather Shield also had problems with the failure of pumps on the Erdman equipment which Dow Corning had explained to be part of the tested equipment adapted for use with InstantGlaze. Weather Shield continued looking for solutions through 2007, but ultimately decided to stop using InstantGlaze in the first quarter of 2008.

Dow Corning argues that Weather Shield's claim that it was impossible to maintain its required tight processing controls during manufacturing when the plasticity of InstantGlaze varied is refuted by the following: (1) the testing results Weather Shield shared with Dow Corning, determining that InstantGlaze I and II were appropriate for its applications; (2) Weather Shield continuing to use InstantGlaze products for four years, during which time Weather Shield conducted extensive testing of the product; (3) Weather Shield's engineering team approving of InstantGlaze

II and although they were aware of the need to re-examine their equipment and process they felt InstantGlaze II provided them what they needed; (4) Dan Nordgren from Weather Shield reporting in May 2006 that the results with InstantGlaze WS were "very good"; (5) Weather Shield permitting Dow Corning to use the Weather Shield name in Dow Corning's marketing efforts; and (6) nearly four months after Weather Shield discontinued use of InstantGlaze due to its alleged deficiencies, Weather Shield asked to purchase more. (Pl.'s Mot. for Summ. J. at 7-8, Exs. P, S, U-W).

According to Dow Corning, Weather Shield witnesses could recall only a couple of times when Weather Shield received InstantGlaze outside the appropriate range, and even then Weather Shield was able to use the material. Dow Corning contends that Weather Shield does not assert that the InstantGlaze it received fell outside of the stated plasticity ranges, rather Weather Shield complains that it learned well into its manufacturing effort that the stated ranges were too broad, purportedly causing too much variability in the product.

According to Dow Corning, Weather Shield's Director of Purchasing notified Dow Corning that Weather Shield intended to cease using Dow Corning's Sealant Products by the end of the first quarter of 2008. Dow Corning then invoiced Weather Shield for the overdue amount on the loan for 2007 on July 25, 2008, which Weather Shield paid. Weather Shield ceased using the Sealant Products in early 2008 and since that time has been using other products in their place. Weather Shield continued using the Nordson Pumps with the other products in contravention of the March 22, 2004 Agreement, and without paying for them.

## II

### A

The creation of express warranties under the UCC is governed by MCL § 440.2313, which

provides in relevant part:

> (1) Express warranties by the seller are created as follows:
>   (a) An affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>   (b) A description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>   (c) A sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.
> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he or she have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty . . . .

An express warranty may be created only between a seller and a buyer, and any such express warranty becomes a term of the contract itself. *See* Official Comment 2 to UCC § 2-313 (noting that "this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale"). The Michigan Supreme Court has long implicitly recognized that an express warranty is no different than any other term of the contract. *See Salzman v. Maldaver*, 315 Mich. 403, 412 (1946) (observing that "where a written contract is clear and unambiguous, parol evidence of prior negotiations and representations cannot be adduced to create an express warranty and thereby vary the terms of the contract"); *Murphy v. Gifford*, 228 Mich. 287, 297-98 (1924) (observing that "where there is a written contract containing an express warranty no other or different may be inferred").

MCL § 440.2313 clearly provides that express warranties are limited to statements, descriptions, representations, samples, and models that are "made part of the basis of the bargain." Nevertheless, "[t]he UCC does not require that express warranties be made a part of the written agreement of the parties, and express warranties may be added by proof of oral warranties so long

as the writing is not itself a complete integration of the agreement." *Price Bros. Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 422 (6th Cir. 1981) "However, any statements not incorporated in the written sales agreement must be shown to be a part of the bargain of the parties before they can be recognized as express warranties." *Price*, 649 F.2d at 422. "The trier of fact must determine whether the circumstances necessary to create an express warranty are present in a given case." *Overstreet v. Norden Laboratories, Inc*., 669 F.2d 1286, 1290 (6th Cir.1982). The fact that a buyer may have an "understanding" does not give rise to an express warranty under MCL § 440.2313 when no express statement of warranty has been made. *Latimer v. William Mueller & Son, Inc.*, 149 Mich. App. 620, 631 (Ct. App. 1986). Nor is a "general expression of opinion" sufficiently specific to create an express warranty under MCL § 440.2313. *McGhee v. GMC Truck & Coach Div., Gen. Motors Corp.*, 98 Mich. App. 495, 501 (Ct. App. 1980).

Under Michigan's version of the Uniform Commercial Code, advertisements and promotional literature can be a part of the basis of the bargain and thus constitute express warranty where they are prepared and furnished by a seller to induce purchase of its products and the buyer relies on the representations. *Kraft v. Dr. Leonard's Healthcare Corp.*, 646 F. Supp. 2d 882, 890 (E.D. Mich. 2009). If representations are made after the initial contractual arrangements, they may become warranties and need not be supported by consideration if it is otherwise reasonable and in order. *See* U.C.C. § 2-209.

**B**

The purpose of the doctrine of implied warranty of fitness for use, by contrast to an express warranty, is to promote high standards in business and to discourage sharp dealings. *Wade v. Chariot Trailer Co.*, 331 Mich. 576, 581 (1951). The Michigan statutes also provide for exclusion or

modification of these implied warranties in certain instances. In re Second Chance Body Armor, Inc., 417 B.R. 750, 758 (Bkrtcy. W.D. Mich. 2009). The existence of an implied warranty of fitness for a particular purpose is contingent on two general facts. *Price Bros. Co.*, 649 F.2d at 423. First, the seller must be aware at the time of contracting of a particular purpose for which the buyer intends to use the goods. *Id.* Second, the buyer must rely on the seller's skill or judgment to select or furnish goods suitable for that particular purpose. *Id.*

The Michigan Uniform Commercial Code states that the implied warranty of merchantability may be excluded or modified by language that mentions merchantability and, in case of a writing, is conspicuous. MCL § 440.2316(2). The implied warranty of fitness for a particular purpose may also be excluded or modified if the exclusion is in writing and is conspicuous. Id. The Michigan U.C.C. further provides:

> (3) Notwithstanding subsection (2):
> (a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and
> (b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and
> (c) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade . . . .

MCL § 440.2316(3). Because warranties of fitness for buyer's intended use arise by implication they may also be negated by contrary contractual terms. *McGhee v. GMC Truck & Coach Division*, 98 Mich. App. 495, 500 (Ct. App. 1980).

### III

The parties papers extensively review the events leading to the relevant contractual

arrangements and the later efforts to successfully use InstantGlaze. However, the issues are framed in an unusual manner because the substance of Weather Shield's counterclaim is first primarily addressed in Weather Shield's Response to Dow Corning's motion for summary judgment. Accordingly, additional attention to the legal questions raised by the case would be helpful to the Court. Clearly, the central question framed by the parties' attention to Weather Shield's counterclaim is whether Dow Corning, the seller of the window sealant, or Weather Shield, the purchaser of the product, intended to bear the risk of loss if the sealant did not meet the parties' expectations. Weather Shield asserts in its counterclaim that Dow Corning expressly warranted that the sealant would meet Weather Shield's expectations. That is, in the language of U.C.C. § 2-313, that Dow Corning made an affirmation of fact or promise to the buyer about the sealant that became "part of the basis of the bargain" that the product would meet Weather Shield's unique expectations. Moreover, Weather Shield also appears to contend that the express warranty extended to the future performance of the sealant in Weather Shield's particular manufacturing process.

That said, however, it remains unclear from the pleadings what Weather Shield contends the precise express warranties made by Dow Corning were and how they were violated. Similarly, Weather Shield pleads in the alternative in their counterclaim that even if there was no express warranty about the sealants future performance, a warranty of fitness for a particular purpose should be implied. That is, in the language of U.C.C. § 2-315, that Dow Corning had reason to know that Weather Shield was relying on the Dow Corning's skill or judgment to furnish the sealant to satisfy Weather Shield's "particular purpose." Again, however, in light of both parties' extensive pre-contract investigation of the product, the particular facts that Weather Shield is relying on to suggest that it relied on Dow Corning's skill or judgment and not their own, remains illusive.

-17-

Dow Corning, on the other hand, asserts that even if an express warranty was made or an implied warranty reasonably implied–matters they do contest–they reasonably disclaimed any warranty responsibility. Dow Corning's assertions, however, are complicated by unaddressed problems of contract formation. That is, Dow Corning sought to limit its warranty obligation in its initial draft of the sales contract (Def.s' Resp. to Pl.'s Mot. for Summ. J. Ex. 10) but the request was rejected by Weather Shield and the disclaimer provisions purposefully eliminated by Dow Corning in the final letter agreement. (Def.s' Resp. to Pl.'s Mot. for Summ. J. Exs. 11-15). Dow Corning appears to argue that even though they purposefully excluded the disclaimer from the contract as a result of later negotiations, that it can reasonably be implied back into the agreement by general reference to Product Information sheets that include a disclaimer. While the disclaimer may exist in the Product Information sheets, no explanation is furnished concerning Dow Corning's apparent intention to comply with Weather Shield's request that the provisions be eliminated. Again, further explanation and briefing would assist the Court.

### III

Accordingly, it is **ORDERED** that both parties are **DIRECTED** to file supplemental briefing addressing the issues presented above on or before **January 24, 2011.**

It is further **ORDERED** that both parties are **DIRECTED** to file a response brief on or before **February 14, 2011.**

s/Thomas L. Ludington  
THOMAS L. LUDINGTON  
United States District Judge

Dated: December 20, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 20, 2010.

          s/Tracy A. Jacobs
          TRACY A. JACOBS